IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ISLAND PEAK GROUP, LLC, D/B/A TEXAS TAX PROTEST, | § | |
| | § | Civil Action No. 3:24-CV-3135-D |
| Plaintiff/Consolidated Defendant, | § | |
| | § | (Consolidated with |
| VS. | § | Civil Action No. 3:25-CV-1073-D) |
| | § | |
| OWNWELL, INC., | § | |
| | § | |
| Defendant/Consolidated Plaintiff. | § | |

MEMORANDUM OPINION
AND ORDER

In these consolidated actions in which Ownwell, Inc. ("Ownwell") is the defendant/consolidated plaintiff and Island Peak Group, LLC ("IPG"), d/b/a Texas Tax Protest ("TTP") and Icon Property Tax Appeal ("Icon"), is the plaintiff/consolidated defendant, IPG moves to dismiss Ownwell's second amended complaint ("SAC") under Fed. R. Civ. P. 12(b)(6) for failure to state a claim on which relief can be granted. For the reasons that follow, the court grants the motion in part and denies it in part and grants Ownwell leave to replead.

I

The court assumes the parties' familiarity with its prior memorandum opinion and order in these consolidated cases,[1] and recounts the facts and procedural history only as is

[1]*See Island Peak Grp., LLC v. Ownwell, Inc.*, 2025 WL 1643441, at *1-4 (N.D. Tex. June 10, 2025) (Fitzwater, J.).

necessary to understand this memorandum opinion and order.[2]

This lawsuit involves a dispute over IPG's advertising and business practices. IPG and Ownwell are competitors in the property tax consulting market. IPG conducts business under two assumed names: TTP and Icon. Property tax consulting firms help property owners reduce their property tax liability in exchange for a percentage of the resulting savings. These firms specialize in lowering the taxing entity's assessment of a property's value, which, in turn, lowers the property tax.

Ownwell alleges that IPG has unfairly diverted business from Ownell by copying its intellectual property and running false or misleading advertisements. On April 15, 2025 Icon launched an advertisement on Facebook. According to Ownwell, this advertisement implicitly targeted Ownwell and contained false or misleading statements about its services. In the same month, Icon updated and launched its website. Ownwell contends that Icon copied its website in three key ways.

First, Icon mimicked the overall "look and feel" of Ownwell's website, infringing on its distinctive trade dress. SAC ¶ 175.

Second, Icon copied verbatim three of Ownwell's frequently asked questions ("FAQs") and their responses and published them on its website. Ownwell alleges that,

[2]The court recounts the background facts favorably to Ownwell as the nonmovant. In deciding a Rule 12(b)(6) motion to dismiss, "[t]he 'court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004) (addressing Rule 12(b)(6) standard)).

following their publication on Icon's website, in the same month, it notified IPG that it was infringing Ownwell's copyrighted works. Ownwell registered the copyrights for each of these works on July 16, 2025. IPG allegedly republished the infringing content after the copyrighted works's registration date.

Third, IPG violated the terms of use agreement for Ownwell's website. According to Ownwell, IPG data-mined Ownwell's website to obtain its proprietary data and reverse engineer Ownwell's "potential savings tool" to create its own "property insights tool." *Id.* ¶ 189. Ownwell's "potential savings tool" functions as a publicly available search bar featured on its website. *Id.* ¶ 135. When an address is entered into the search bar, Ownwell's software generates an estimate of potential savings that individuals can receive on their property taxes by contracting with Ownwell. Ownwell asserts that IPG used "automated tools to systematically record" the output data generated by its "potential savings tool" to create its own "property insights" tool, which Ownwell alleges is "essentially a copy of its potential savings tool." *Id.* ¶ 149.

In Ownwell's SAC, it alleges federal-law claims against IPG for false advertising and trade dress infringement under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); copyright infringement, under 17 U.S.C. § 501; violations of the Computer Fraud and Abuse Act ("CFAA"), under 18 U.S.C. § 1030(a)(2)(C); and supplemental state-law claims for misappropriation; unjust enrichment; and breach of contract, under Texas common law. IPG moves under Rule 12(b)(6) to dismiss all of Ownwell's claims, except its breach of contract claim, for failure to state a claim on which relief can be granted. Ownwell opposes the

motion, which the court is deciding on the briefs, without oral argument.

II

The court turns initially to IPG's request to take judicial notice of the website screenshots that it has submitted. Generally, when a party does not contest the accuracy of website screenshots, the court will take judicial notice of the attached material. *See HCL Techs. Ltd. v. Atos S.E.*, 2024 WL 1076821, at *3 (N.D. Tex. Jan. 31, 2024) (Horan, J.), *rec. adopted*, *HCL Techs. Ltd. v. Atos S.E.*, 2024 WL 1094697 (N.D. Tex. Mar. 12, 2024) (Lindsay, J.). Ownwell disputes whether the screenshots accurately depict Icon's and Ownwell's websites on July 9, 2025 because the dates are not featured in the screenshots themselves. The court concludes that, absent additional indicia of trustworthiness, the accuracy of the screenshots is "subject to reasonable dispute," Fed. R. Evid. 201(b), and therefore declines to take judicial notice.[3]

III

"In deciding a Rule 12(b)(6) motion to dismiss, the court evaluates the sufficiency of [the plaintiff's second amended complaint] by 'accept[ing] all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *Bramlett v. Med. Protective Co. of Fort Wayne, Ind.*, 855 F.Supp.2d 615, 618 (N.D. Tex. 2012) (Fitzwater, C.J.) (second alteration in original) (internal quotation marks omitted) (quoting *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007)). To survive a Rule 12(b)(6) motion to

---

[3]Even if the court were to take judicial notice, doing so would not alter the court's analysis of IPG's motion.

dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level[.]"). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (alteration omitted) (quoting Rule 8(a)(2)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678.

IV

The court considers first whether Ownwell has stated a Lanham Act false advertising claim on which relief can be granted.

A

> The plaintiff must establish five elements to make out a *prima facie* case of false advertising under the Lanham Act: "(1) A false or misleading statement of fact about a product; (2) Such statement either deceived or had the capacity to deceive a substantial segment of potential consumers; (3) The deception was material, in that it is likely to influence the consumer's purchasing decision; (4) The product is in interstate commerce; and (5) The plaintiff has been or is likely to be injured as a result of the statement at issue."

*IQ Prods. Co. v. Pennzoil Prods. Co.*, 305 F.3d 368, 375 (5th Cir. 2002) (quoting *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 495 (5th Cir. 2000)). The parties dispute whether Ownwell has plausibly pleaded the first element. A statement of fact is "false or misleading" if it is either literally untrue or capable of creating a false impression in the consuming public. *Id.*; *Pizza Hut*, 227 F.3d at 495; *see* 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 27:53 (5th ed. 2025).

B

IPG contends that Ownwell has not plausibly pleaded that IPG's Facebook advertisement contained a false or misleading statement of fact.[4] The statement at issue in the advertisement reads: "I got owned with the firm I used last time. The twenty-five percent performance fee turned in ta [sic]—well, a lot more than twenty-five percent when I needed

[4]The court in its discretion limits its analysis to the alleged statement in IPG's Facebook advertisement described below. Ownwell alleges, and IPG disputes the falsity or misleading nature of, numerous other statements. The court is limiting its analysis because its conclusion that Ownwell has plausibly pleaded that this statement was false or misleading is dispositive of Ownwell's motion to dismiss for failure to plead the first element. *See IQ Prods.*, 305 F.3d at 375.

support with my appeal." SAC ¶ 108. IPG maintains that the statement "I got owned" was "non-literal, subjective and puffery." Consol. D. Br. (ECF No. 54) at 4.

Ownwell responds that IPG is misrepresenting the basis of the allegation. It concedes that the statement "I got owned," in isolation, is not false or misleading, but it maintains that the actor's emphasis on the word "owned" in the advertisement, as well as the reference to a 25% performance fee, demonstrates that IPG was implicitly targeting Ownell. According to Ownwell, the implicit targeting, along with the statement that the individual eventually paid "a lot more than twenty-five percent," renders the advertisement false or misleading.

Ownwell relies on the following allegations to show it was implicitly targeted: (1) it is the "only entity in the tax protest market . . . whose name begins with the 'own' term"; (2) given the "prominence" of Ownwell, a "reasonable consumer would make an association" between Ownwell and the company who "owned" the individual in the advertisement; (3) because Ownwell "pioneered offering a twenty-five percent performance fee," the individual's specific reference to the "'other company' offering twenty-five percent" identifies Ownwell by implication; and (4) IPG coordinated the Facebook Advertisement with "the Ad Word/purchased search term 'Ownwell,'" so that a customer searching for Ownwell would construe the advertisement as an attack on Ownwell and its services. SAC ¶¶ 110-113. Next, Ownell alleges that the advertisement was false or misleading for two reasons. First, Ownwell contends that the characterization of its services is false because the advertisement implies that Ownwell's customers have to conduct their tax protest on their own and that Ownwell's fee increases if a customer needs support with an appeal. And,

second, Ownwell alleges that its "fee for conducting an appeal will not exceed 25%." Consol. P. Resp. (ECF No. 58) at 5.

C

The court concludes that Ownwell has plausibly pleaded that IPG, by implicitly targeting Ownwell, has made a false or misleading statement of fact concerning Ownwell's services. Claims may be brought under the Lanham Act for false advertising when a competitor's advertisement "misrepresent[s] the qualities or characteristics of its own goods or products or of the plaintiff's goods or products." *Colo. Biolabs, Inc. v. Three Arrows Nutra, LLC*, 2025 WL 2524313, at *14 (N.D. Tex. Sept. 2, 2025) (Fitzwater, J.) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 137-38 (2014)). And there is no requirement that a company "specifically mention its competitors" for a claim to be actionable. *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 946 (3d Cir. 1993) (holding that failure to mention specific competitors did not render the statement puffery in the context of comparative advertising).

Here, despite the fact that IPG's advertisement did not name Ownwell explicitly, Ownwell has plausibly pleaded that IPG's advertisement concerned Ownwell's services by alleging that the advertisement emphasized the word "owned" and referenced Ownwell's 25% performance fee—which it purportedly pioneered. It is also plausible, based on Ownwell's characterization of its own services as well as its allegation that it does not charge beyond a 25% performance fee, that the statement was false or misleading.

Accordingly, the court concludes that Ownwell has plausibly pleaded a Lanham Act-

based false advertising claim on which relief can be granted, and it denies IPG's motion to dismiss this claim.

V

The court now considers whether Ownwell has stated a Lanham Act trade dress infringement and false designation of origin claim on which relief can be granted.

A

Trade dress "refers to the total image and overall appearance of a product and may include features such as the size, shape, color, color combinations, textures, graphics, and even sales techniques that characterize a particular product." *Test Masters Educ. Servs., Inc. v. State Farm Lloyds*, 791 F.3d 561, 565 (5th Cir. 2015) (quoting *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 251 (5th Cir. 2010)). Trade dress protection aims to "secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 774 (1992) (quoting *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 198 (1985)).

In the Fifth Circuit, the court conducts a two-step analysis when analyzing a trade dress infringement claim. *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 813 (5th Cir. 1989). Initially, the court examines functionality, distinctiveness, and secondary meaning to ascertain whether the product trade dress qualifies for protection. *Urgent Gear, Inc. v. Savoia*, 2001 WL 1577395, at *2 (N.D. Tex. Dec. 10, 2001) (Fitzwater, J.) (citing *Blue Bell Bio-Med. v. Cin-Bad, Inc.*, 864 F.2d 1253, 1256 (5th Cir. 1989)). A trade dress is

entitled to protection if it is non-functional and is "either inherently distinctive or has acquired distinctiveness through secondary meaning." *Id.* (citing *Two Pesos, Inc.*, 505 U.S. at 769). Then, if protected, the court must determine "whether the trade dress is being infringed, that is, whether defendants are using the same or similar trade dress that is likely to confuse consumers." *Id.* (citing *Blue Bell Bio-Med.*, 864 F.2d at 1256; *Sno-Wizard Mfg., Inc. v. Eisemann Prods. Co.*, 791 F.2d 423, 425 (5th Cir. 1986)).

Increasingly, "courts have confronted whether trade dress protection can extend to websites." *Test Masters Educ. Servs., Inc.*, 791 F.3d at 565. The Fifth Circuit has suggested that a website's "look and feel" may, in appropriate circumstances, constitute protectable trade dress. *Id.* at 566 ("[I]t is possible that an allegation that [a defendant] is using a 'confusingly similar' website could be the basis of a trade dress infringement claim.").[5] Two initial pleading requirements have emerged for a "web dress" claim.

First, a plaintiff "must list the elements that make up the trade dress." *UWorld LLC v. USMLE Galaxy LLC*, 2023 WL 4475618, at *6 (N.D. Tex. June 27, 2023) (Horan, J.), *rec. adopted*, *UWorld LLC v. USMLE Galaxy LLC*, 2023 WL 4485923 (N.D. Tex. July 11, 2023) (Kinkeade, J.); *see also Salt Optics, Inc.*, 2011 WL 13055856, at *3 (C.D. Cal. Mar. 4, 2011)

[5]Leading commentators, however, have expressed doubt as to how far trade dress protections can practically extend to websites. *See* 1 McCarthy, *supra*, § 8:7.25 ("[I]t is probable that few Web sites have an appearance that is so unusual or distinctive that it can constitute what might be called protectable 'web dress' or 'site dress.' Some parts of the appearance of Web sites will be ineligible for protection as being 'functional.' While a few courts have been receptive to claims [concerning] web site trade dress infringement, most courts have not been impressed with arguments that a particular Web site design is so distinctive as to constitute trade dress that is infringed by another.").

(same). Second, the plaintiff must "also allege that these discrete elements combine into a common 'look and feel' of a website.'" *UWorld LLC*, 2023 WL 4475618, at *6 (quoting *Express Lien, Inc. v. Handle, Inc.*, 2020 WL 3868442, at *5 (E.D. La. July 9, 2020)). District courts that have addressed this issue in the same context have concluded that "a general description of the site," *Bryant v. Matvieshen*, 904 F.Supp.2d 1034, 1046 (E.D. Cal. 2012), or "mere[ly] cataloguing . . . a website's features" is insufficient. *Salt Optics, Inc.*, 2011 WL 13055856, at *2.

B

The court concludes that Ownell has failed to plausibly plead a claim for trade dress infringement under the Lanham Act because the alleged elements are functional and not protectable.

1

Ownwell alleges that eight "discrete" elements combine to create a common "look and feel" of its website:

> (1) house in blue on the top, left-hand side of the page; (2) blue background on the Landing Section; (3) the call to save money that is prominently featured in the top, center of the page; (4) the request to receive an address underneath the call to save; (5) the banner centered beneath the call to action that tells the customer that (a) they only pay if they save, (b) incur zero upfront fees, and (c) engage with tax experts who have local experience; (6) the design, organization, selection, and arrangement of the review wall on the page; (7) the design, organization, selection, and arrangement of the FAQ section on the page; and (8) the use of the specific terms and phrases that are part of Ownwell's FAQ section that Island Peak copied verbatim.

SAC ¶ 174. Ownell contends that, "taking all of the elements listed above together," IPG has copied the "look and feel" of its website. *Id.* ¶ 175. As Ownwell notes, some district courts have held that listing discrete elements of a website, together with an allegation that these elements constitute a common "look and feel" of the website, can satisfy the minimum pleading requirements necessary to survive a motion to dismiss. *See, e.g.*, *Express Lien, Inc.*, 2020 WL 3868442, at *5; *Lepton Labs, LLC v. Walker*, 55 F.Supp.3d 1230, 1240-41 (C.D. Cal. 2014); *DOT Operating Auth., Inc. v. DOT Operations, Inc.*, 2025 WL 2631606, at *6-7 (C.D. Cal. July 24, 2025).

Even when a party alleges a discrete list of elements, however, courts still may examine distinctiveness and functionality. *See, e.g.*, *Express Lien, Inc.*, 2020 WL 3868442, at *3-4. In fact, courts examine website trade dress allegations with "an exacting eye" because the "elements comprising a website's overall 'look and feel' can be more difficult to pin down" than traditional trade dress allegations. *Salt Optics, Inc.*, 2011 WL 13055856, at *2.

2

"[A] product feature is functional . . . if it is essential to the use or purpose of the article or if it affects the cost or quality of an article." *See Eppendorf-Netheler-Hinz GMBH v. Ritter GMBH*, 289 F.3d 351, 355 (5th Cir. 2002) (quoting *Traffix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 32 (2001) (internal quotation marks omitted)). A secondary test also recognized in *Traffix*, called the "competitive necessity" test, states that "a functional feature is one the 'exclusive use of which would put competitors at a significant

non-reputation-related disadvantage.'" *Traffix*, 532 U.S. at 32 (alteration omitted) (quoting *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 165 (1995)). Ownwell's trade dress infringement claim fails because it has not alleged sufficient facts to plausibly plead that the elements alleged to constitute its trade dress are nonfunctional and protectable. *Bayco Prods., Inc. v. Lynch*, 2011 WL 1602571, at *8 (N.D. Tex. Apr. 28, 2011) (Fitzwater, C.J.). Elements three, four, and five are all functional because they "play a critical role in the consumer demand for [Ownwell's] services," or otherwise "affect the quality of [its] business." *Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 311 (3d Cir. 2014) (citing *TrafFix*, 532 U.S. at 32).

Ownwell's "request to receive an address" exists so that customers can enter their addresses and receive an estimate of their savings if they contract with Ownwell. It is definitionally functional. And Ownwell's banner informing customers that "(a) they only pay if they save, (b) incur zero upfront fees, and (c) engage with tax experts who have local experience" simply provides the terms of Ownwell's services. Providing its terms impacts demand, and the terms themselves directly "affect[] the cost or quality" of its services. *See id.* (finding that "[s]tudent feedback procedures, catamarans, teaching itineraries, and curriculum" all "affect[ed] the quality" of the business at issue). Moreover, should a competitor offering the same terms be prohibited from displaying this information on the landing page of its website, it would be put at a "significant non-reputation-related disadvantage." *TrafFix*, 532 U.S. at 32 (quoting *Qualitex Co.*, 514 U.S. at 165). Finally, Ownwell's "call to save money" is merely a generic statement aimed at increasing demand

for its services. Aside from describing the physical positioning of each of these elements on its website and characterizing the fifth element as a "banner," none of these alleged elements relates to the aesthetic, style, or visual appearance of the website. That is, none serves to "merely identify[] [Ownwell]" as the "source" of its property tax consulting services. *Fair Wind Sailing, Inc.*, 764 F.3d at 311 (citing *TrafFix*, 532 U.S. at 32).

Ownwell's eighth alleged element is likewise not protectable as trade dress. This element, as pleaded, expressly concerns "specific terms and phrases . . . that Island Peak copied verbatim" from Ownwell's FAQ section. SAC ¶ 174. This is not an allegation of "aesthetic similarity," but rather, an allegation of copying of written information (some of which Ownwell claims is protected by copyright) concerning the nature and quality of Ownwell's services. *Test Masters Educ. Servs., Inc.*, 791 F.3d at 566. The "specific terms and phrases" do not serve to identify Ownwell. Instead, they are functional, providing prospective customers with answers to questions concerning Ownwell's services and property taxes as a whole. Trade dress protection "must subsist with the recognition that in many instances there is no prohibition against copying goods and products," and that absent a patent or copyright, content may "be subject to copying." *TrafFix Devices, Inc.*, 532 U.S. at 29.

Elements six and seven are deficient as well. Ownwell lists its review wall and FAQ page as discrete elements, asserting trade dress protection for their "design, organization, selection, and arrangement." SAC ¶ 174. Ownwell fails, however, to allege in sufficient detail what it requests protection for. There are no allegations concerning the layout,

typography, color, or even the design. Instead, Ownwell merely attaches photos of the web pages to its SAC. Absent greater detail, these allegations are inadequate to plead a plausible claim. *Cf. UWorld LLC*, 2023 WL 4475618, at *6 (finding attaching several images and side-by-side comparisons to be insufficient to adequately plead trade dress infringement).

The remaining two elements—a "house in blue on the top, left-hand side of the page" and "blue background on the Landing Section"—are aesthetic. But considering the level of generality with which they are pleaded, together with the deficiencies identified above, the they are insufficient to save Ownwell's claim. Even in cases where courts have held that a plaintiff's allegations of web dress might survive a motion to dismiss, the alleged stylistic aspects of the website were far more specific. *See, e.g.*, *Express Lien, Inc.*, 2020 WL 3868442, at *3 (E.D. La. July 9, 2020) (holding a web dress infringement claim was adequately pleaded where plaintiff alleged, among other elements, the "frequent use of 'Lato' font in light gray for paragraph text, directly beneath a darker, bolder header in 'Lato' font, often featuring a short blue dash offset to the left between the header and the paragraph text").

The court recognizes that a unique combination of functional or otherwise generic qualities may give rise to claim of trade dress infringement when such elements combine to create a "common look or feel" of a website. Here, however, Ownwell's pleading deficiencies are not cured when the elements are considered as a whole. Although Ownwell alleges that its proffered elements "combine" into a common "look and feel," it fails to plead how. At bottom, Ownwell has merely provided "a general description of the site," *Bryant*,

904 F.Supp.2d at 1046, "cataloguing . . . [its] features," many of which, are purely functional. *Salt Optics, Inc.*, 2011 WL 13055856, at *2. The court is not holding that websites in general, or even Ownwell's website in particular, can never qualify for trade dress protection. The court is only concluding that the SAC does not adequately plead a protectable trade dress.

Although the inquiry into product functionality can be "fact-intensive," *Loops, LLC v. Amercare Products, Inc.*, 63 F.Supp.2d 1128, 1136 (W.D. Wash. 2008), the court must determine at the Rule 12(b)(6) stage whether Ownwell has pleaded a plausible claim under the standard of *Iqbal*, 556 U.S. at 679-80. There may be circumstances, of course, in which the necessity to make a fact intensive evaluation precludes the pretrial entry of judgment as a matter of law. But *Iqbal* specifically permits the "reviewing court to draw on its judicial experience" and take into account the factual context presented in the pleadings, even though "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task." *Id.* at 679. Therefore, considering the allegations of the SAC (including the terminology that Ownell uses to describe its own trade dress) and the attached images of its website, the court concludes that Ownwell has not pleaded a plausible claim that its trade dress is nonfunctional and protectable. *See* 15 U.S.C. § 1125(a)(3) (placing burden of proof on person asserting protection for non-registered trade dress to prove non-functionality).

Accordingly, the court concludes that Ownwell has not stated a trade dress infringement claim on which relief can be granted, and it grants IPG's motion to dismiss in

this respect.

VI

The court now considers whether Ownwell has stated a copyright infringement claim on which relief can be granted and whether its claim for statutory damages and attorney's fees should be dismissed.

A

To state a claim for copyright infringement, a plaintiff must allege "ownership of a valid copyright and copying of constituent elements of the work that are copyrightable." *Compaq Computer Corp. v. Ergonome Inc.*, 387 F.3d 403, 407 (5th Cir. 2004) (quoting *Eng'g Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1340 (5th Cir. 1994) (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1999))). The Copyright Act provides that a certificate of copyright registration "made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright[.]" 17 U.S.C. § 410(c).

B

Ownwell has satisfied the pleading requirements at this stage. Ownwell alleges that it owns three copyrighted works, entitled: (1) "How is your fee calculated?"; (2) "Is there any risk to my property by signing up?"; and (3) "How are property taxes calculated?" SAC ¶¶ 39-43. It has attached copies of their registrations as exhibits to its complaint. IPG contends that Ownell must replead its claim because it is unclear what the "works" entail, because Ownell provides only a limited description of the alleged copyrighted material. The

court disagrees.

In the copyright infringement section of its SAC, Ownwell provides photos from its website, with the same titles as the registered copyrights above, compared side-by-side to photos of Icon's website. Ownwell then alleges, consistent with the provided images, that the text in the registered works was copied "verbatim," with one minor exception: the listing of two additional states in one of the works. *Id.* ¶ 36. Shortly thereafter, Ownwell lists the registration numbers discussed above. *Id.* ¶¶ 39-43.

Further clarifying that the scope of the works extends beyond their titles, Ownwell alleges that the "[c]opyrighted [w]orks . . . constitute proprietary information, that Ownwell has distilled into well-crafted, *specific responses to frequently asked questions*." *Id.* ¶ 65 (emphasis added). This is an explicit allegation that the copyrighted works include both the title and response text. Accordingly, Ownwell has plausibly pleaded a copyright infringement claim for the three listed works, which includes their title and accompanying response text, as alleged in its SAC.[6]

C

The court considers next whether Ownwell has adequately pleaded a claim for statutory damages and attorney's fees for infringement of its copyrighted works. Ownwell seeks damages pursuant to 17 U.S.C. § 504(b) and § 505. 17 U.S.C. § 412 provides:

---

[6]In its brief, IPG broadly raises the issue of originality. The court does not now reach that issue. But if IPG has grounds to contest the copyrightability of these works, it may do so at a later procedural stage.

> [N]o award of statutory damages or of attorney's fees, as provided by sections 504 and 505, shall be made for—
> (1) any infringement of copyright in an unpublished work commenced before the effective date of its registration; or
> (2) any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work.

Moreover, as the Fifth Circuit has explained: "a plaintiff may not recover an award of statutory damages and attorney's fees for infringements that commenced after registration if the same defendant commenced an infringement of the same work prior to registration." *Mason v. Montgomery Data, Inc.*, 967 F.2d 135, 144 (5th Cir. 1992); *see also S. Credentialing Support Servs., L.L.C. v. Hammond Surgical Hosp., L.L.C.*, 946 F.3d 780, 786 (5th Cir. 2020) ("[S]ection 412 bars statutory damage awards when a defendant violates one of the six exclusive rights of a copyright holder preregistration and violates a different right in the same work after registration.").

Ownwell alleges that the copyrighted works were published on April 17, 2024 and registered on July 16, 2025. It contends that IPG first began infringing these copyrighted works "at least as early as April 15, 2025," when IPG began featuring them on its website. SAC ¶ 160. In sum, Ownwell pleads that registration did not occur until more than one year after publication and that infringement began before the effective date of the works's registration. Accordingly, § 412 bars statutory damages and attorney's fees for Ownwell's copyright claim.

Ownwell maintains that it is entitled to statutory damages or attorney's fees because

IPG's republication is a "new infringement and not a 'continuation' of the preregistration infringement," considering that IPG "materially changed its website in the republication." Consol. P. Resp. (ECF No. 58) at 21. The court disagrees. While it is true, based on the exhibits Ownwell has provided, that the Icon website changed between April 22, 2025 and July 27, 2025, an examination of the exhibits on which Ownwell relies shows that the alleged infringement of the three copyrighted works is identical.

Even assuming that, by republishing its website, Icon committed "new infringement[s]" of the same works, the language of § 412 establishes that statutory damages are denied "not only for the particular infringement that a defendant commenced before registration, but for all of that defendant's infringements of a work if one of those infringements commenced prior to registration." *Mason*, 967 F.2d at 144. Ownwell cites no authority to the contrary. Accordingly, the court dismisses Ownwell's claim for statutory damages and attorney's fees stemming from its copyright claim.

VII

The court now considers whether Ownwell has stated common law misappropriation or unjust enrichment claims on which relief can be granted.

A

Ownell's misappropriation and unjust enrichment claims are premised on three identical allegations: (1) IPG copied elements of Ownwell's trade dress; (2) IPG copied Ownwell's copyrighted materials ("copyrighted works allegations"); and (3) IPG used Ownwell's "potential savings tool" to acquire data from Ownwell's website to reverse

engineer its own "property insights tool" ("data scraping allegations").

B

IPG and Ownwell dispute whether misappropriation claims premised on trade dress infringement can be properly brought. The court need not reach these arguments, however, because Ownwell has not adequately pleaded a trade dress infringement claim. Accordingly, Ownwell's claims for misappropriation and unjust enrichment find no support in Ownwell's alleged "distinctive trade dress." SAC ¶¶ 186, 195.

C

IPG and Ownwell likewise dispute whether Ownwell's Texas-law claims for misappropriation and unjust enrichment are preempted by the Copyright Act. IPG contends that, in cases where misappropriation and unjust enrichment claims are advanced and the intellectual property at issue is within the subject matter of copyright, the claims are preempted by the Copyright Act. Ownwell responds that its misappropriation and unjust enrichment claims are not preempted because both satisfy the "extra element" test.

This court applies a two-step test to determine "whether the Act preempts a state law cause of action." *Digital Drilling Data Sys., L.L.C. v. Petrolink Servs.*, Inc., 965 F.3d 365, 377 (5th Cir. 2020). First, it examines the state-law claim "to determine whether it falls 'within the subject matter of copyright' as defined by 17 U.S.C. § 102." *Id.* at 377-78 (quoting *Spear Mktg., Inc. v. BancorpSouth Bank*, 791 F.3d 586, 594 (5th Cir. 2015)). If so, the court then determines whether a state-law cause of action "protects rights that are 'equivalent' to any of the exclusive rights of a federal copyright, as defined in 17 U.S.C.

§ 106." *Id.* at 378. Equivalency is analyzed by applying the "extra element" test. *Id.* Under this test, "[p]reemption does not occur if the state law claim requires 'one or more qualitatively different elements.'" *Id.* (quoting *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 787 (5th Cir. 1999)).

D

The court initially examines whether the state-law claims fall within the subject matter of copyright. Ownwell's pleading complicates this analysis for two reasons. Although pleaded under the same individual counts of misappropriation and unjust enrichment, each of the remaining two allegations concerns distinct (alleged) intellectual property. The first concerns its "copyrighted" works. SAC ¶¶ 187, 195. As discussed above, Ownwell alleges "three [c]opyrighted [w]orks" related to its FAQ web page. *Id.* ¶ 160. The second concerns IPG's data collection from Ownwell's publicly available potential savings tool and IPG's alleged subsequent use of these data to create its own analogous tool.

Concerning the copyrighted works allegations, by pleading copyright infringement, Ownwell itself has asserted that they fall within the subject matter of copyright. As for the data scraping allegations, the parties do not directly address whether the allegedly copied "proprietary data" fall within the subject matter of copyright. *Id.* ¶ 196. In Ownell's response brief, it immediately invokes the "extra element" test, maintaining that the additional allegations of data scraping provide the extra element for its misappropriation and unjust enrichment claims as a whole. By contrast, IPG asserts, without explanation, that Ownwell's "repeated allegations of 'scraping' and 'data mining,'" are still a "copyright claim

at its core." Consol. D. Reply (ECF No. 59) at 3. Both parties analyze the allegations congruently.

Step one, however, requires the court to consider whether, even in the absence of copyright *protection* for each of the underlying allegations, they nevertheless fall within the *subject matter* of copyright. At least one district court within the Fifth Circuit has concluded that an unjust enrichment claim was not preempted by the Copyright Act after the court had determined that the factual data at issue were not copyrightable. *See Digital Drilling Data Sys. LLC v. Petrolink Servs. Inc.*, 2018 WL 2267139, at *16 (S.D. Tex. May 16, 2018), *aff'd sub nom., Digital Drilling Data Sys., L.L.C. v. Petrolink Servs., Inc.*, 965 F.3d 365 (5th Cir. 2020). On appellate review, however, the Fifth Circuit appeared to disagree, intimating—although not holding—that factual data may still fall within the subject matter of copyright even if they are not themselves copyrightable. *See Digital Drilling*, 965 F.3d at 378 (stating, in response to the argument that factual data nevertheless fall within the subject matter of copyright, "Indeed, we have recognized that 'the Copyright Act preempts more than it protects' and 'can preempt a state law claim even if the intellectual property lands in one of § 102(b)'s exclusion'" (quoting *Motion Med. Techs., L.L.C. v. ThermoTek, Inc.*, 875 F.3d 765, 773 (5th Cir. 2017))). As the Fifth Circuit has explained, the preemption statute "preempts state protection of works that fall within the subject matter (that is, the scope) of copyright, regardless of whether the works are actually afforded protection under the Copyright Act." *Ultraflo Corp. v. Pelican Tank Parts, Inc.*, 845 F.3d 652, 656 (5th Cir. 2017). And "scope and protections are not synonyms." *Id.* (quoting *Spear Mktg.*, 791 F.3d

at 596). Indeed, "the shadow actually cast by the Act's preemption is notably broader than the wing of its protection." *Id.* at 656-57 (quoting *U.S. ex rel. Berge v. Bd. of Trs. of the Univ. of Ala.*, 104 F.3d 1453, 1463 (4th Cir. 1997)).

For example, in *Spear Marketing* the Fifth Circuit concluded that "state claims based on ideas fixed in a tangible medium of expression fall within the subject matter of copyright even though copyright law does not protect the mere ideas." *Id.* at 657 (citing *Spear Mktg.*, 791 F.3d at 597). And in *Ultraflo Corp.* the Fifth Circuit held that it "should be no different" for "the embodiment of ideas in useful articles." *Ultraflo Corp.*, 845 F.3d at 657. The same is true here. Congress "intended the Copyright Act to protect some expressions but not others," such as factual data, and it "wrote § 301(a) to ensure that the states did not undo this decision." *Digital Drilling*, 965 F.3d at 378 (quoting *Spear Mktg.*, 791 F.3d at 596).

Consequently, without deciding whether the alleged copyrighted works or scraped data are afforded copyright protection, the court finds that both are at least within the subject matter of copyright. *See Am. Airlines, Inc. v. Red Ventures LLC*, 2022 WL 2790643, at *3 (N.D. Tex. July 15, 2022) (Pittman, J.) (finding at the motion to dismiss stage that alleged "proprietary data" fell "within the subject matter of copyright" as defined by 17 U.S.C. § 102); *see also First Am. Bankcard, Inc. v. Smart Bus. Tech., Inc.*, 2016 WL 5869787, at *7 (E.D. La. Oct. 7, 2016) ("The input data used within a software program and the output data generated by a software program are also 'fixed' within a tangible medium (the software) and because the software is within the subject matter of copyright, so too is the data contained within it.").

E

Having determined that step one is met, the court proceeds to step two and analyzes whether the "extra element" test is satisfied.

1

The court concludes, first, that Ownwell's misappropriation claim is preempted. The allegations in this case closely mirror those in *Alcatel*, where the Fifth Circuit held that the misappropriation claim at issue was preempted by the Copyright Act. *Alcatel*, 166 F.3d at 789. In *Alcatel* the Fifth Circuit analyzed whether an "extra element" was present with reference to the same elements that Ownwell alleges are required to plausibly plead its misappropriation claim:

> (i) the creation by plaintiff of a product through extensive time, labor, skill and money; (ii) the use of that product by defendant in competition with plaintiff, thereby giving the defendant a special competitive advantage because he was burdened with little or none of the expense incurred by plaintiff in the creation of the product; and (iii) commercial damage to plaintiff.

*Id.* at 788 (quoting *U.S. Sporting Products, Inc. v. Johnny Stewart Game Calls, Inc.*, 865 S.W.2d 214, 218 (Tex. App. 1993, pet. denied). There, the factual allegations consisted of:

> (1) [T]he reproduction of [plaintiff's] firmware, software, and manuals; (2) the use of these materials in the preparation of allegedly derivative works—[defendant's] microprocessor and expansion cards; and (3) the distribution of these works in competition with [plaintiff].

*Id.* at 789. Here, the factual allegations closely mirror the above. With respect to the alleged copyrighted works, in Ownwell's words, it alleges that: (1) IPG "took"—i.e.,

copied—Ownwell's "copyrighted works"; (2) IPG "published said content and material on its Icon Website"; and (3) IPG used the material to "directly complete" with Ownwell. SAC ¶¶ 187-188.

Moreover, the additional allegations of data scraping do not supply any "extra element." Ownwell alleges that IPG (1) "record[ed]"—i.e., copied—Ownwell's proprietary data; (2) utilized these data to "reverse engineer" Ownwell's algorithms; and (3) used the reproduced tool to "compete with Ownwell." *Id.* ¶¶ 149, 189. As in *Alcatel*, the "acts that form the basis of [Ownwell's] misappropriation claim touch on interests clearly protected by the Copyright Act." *Alcatel*, 166 F.3d at 789.

Accordingly, Ownwell's misappropriation claim is preempted, and the court grants IPG's motion to dismiss that claim.

2

Ownwell's unjust enrichment claim is likewise preempted. A claim for unjust enrichment requires showing that "one party has obtained a benefit by fraud, duress, or the taking of an undue advantage." *Digital Drilling*, 965 F.3d at 378. In *Digital Drilling* the Fifth Circuit held that an unjust enrichment claim was not preempted by the Copyright Act because an "extra element" was present. *Id.* at 379. But it only concluded that an "extra element" was present because the plaintiff's unjust enrichment claim "require[d] establishing . . . wrongful conduct beyond mere reproduction[.]" *Id.* The conduct at issue went "beyond mere copying" and required establishing the "taking [of] undue advantage" because the defendant had surreptitiously installed its own software on various third parties' computers

to "induc[e] [them] to violate the express terms of their . . . licenses" with the plaintiff. *Id.* at 380.

Ownwell alleges that an "extra element" is present here because it has adequately pleaded the taking of an "undue advantage." In *Digital Drilling*, however, the Fifth Circuit observed that "other unjust enrichment claims—even those brought under Texas law—might indeed be preempted by the Copyright Act." *Id.* at 382. And it noted that, had the plaintiff "merely alleged" that the defendant "obtained a benefit" at its "expense by engaging in unauthorized copying," its claim "might well have been preempted by copyright law." *Id.* at 381-82.

The present case presents precisely that circumstance. Ownwell alleges that IPG, without the authorization of an "express, written contract," used automated tools to systematically record data to reverse engineer Ownwell's tool to create its own property insights tool. SAC ¶ 198. In brief, Ownwell asserts that IPG copied its data to copy its tool. Copying data from a publicly facing website—even when done systematically with automated tools—is not analogous to secretly installing software on computers to induce third parties to violate licensing agreements. At bottom, Ownwell's unjust enrichment claim rests on the allegation that IPG "obtained a benefit" at Ownwell's expense by "engaging in unauthorized copying." *Digital Drilling*, 965 F.3d at 381-82. Because Ownwell's unjust enrichment claim does not require establishing that IPG obtained a benefit by "undue advantage," it fails the "extra element" test.

Accordingly, Ownwell's unjust enrichment claim is preempted, and the court grants

IPG's motion to dismiss this claim.

VIII

The court now considers whether Ownwell has stated a claim under the Computer Fraud and Abuse Act ("CFAA") on which relief can be granted.

A

Ownwell alleges that IPG violated 18 U.S.C. § 1030(a)(2)(c), which prohibits "intentionally access[ing] a computer without authorization or exceed[ing] authorized access, and thereby obtain[ing] . . . information from any protected computer." The CFAA "provides a private right of action for '[a]ny person who suffers damage or loss by reason of violation of this section." *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1066 (9th Cir. 2016). A civil action may only be brought if a minimum $5,000 in damages is alleged. *See* 18 U.S.C. § 1030(c)(4)(A)(i)(I).

Ownell asserts that IPG accessed Ownwell's server, which ran Ownwell's website, and obtained data from its website "without authorization." SAC ¶ 214. Furthermore, Ownwell asserts that, by violating its terms of service ("ToU"), IPG intentionally accessed a computer "in excess" of its authorization to obtain information. *Id.*

IPG disputes the CFAA's applicability on two grounds. It contends that it did not access any protected computer or device, either with or without authorization. And it maintains that Ownwell has not plausibly pleaded $5,000 in damages within the meaning of the CFAA.

B

The court initially addresses whether Ownwell has plausibly pleaded that IPG accessed Ownwell's website without authorization, or, if it had some level of authorization, whether IPG exceeded its authorized access, within the meaning of the CFAA.

In *Van Buren v. United States* the Supreme Court examined the scope of the CFAA, with particular focus on the "exceeds authorization" clause. *See generally Van Buren v. United States*, 593 U.S. 374 (2021). The Court held that an individual "exceeds authorized access" when he "accesses a computer with authorization but then obtains information located in particular areas of the computer—such as files, folders, or databases—that are off limits to him." *Id.* at 396. It held that the defendant (a police officer) had not exceeded authorized access in using a law enforcement database that he was authorized to use for an "improper purpose." *Id.* The Court declined to decide whether the initial inquiry—whether one can or cannot access a computer system—"turns only on technological (or 'code-based' limitations) on access, or instead looks to limits contained in contracts or policies." *Id.* at 390 n.8. The Court did, however, express serious concerns about the implications of extending the scope of the CFAA's "exceeds authorization" clause to terms of service agreements.[7]

---

[7]The Court wrote in *Van Buren*:

> If the "exceeds authorized access" clause criminalizes every violation of a computer-use policy, then millions of otherwise law-abiding citizens are criminals. . . . Or consider the Internet. Many websites, services, and databases—which provide "information" from "protected computer[s]," § 1030(a)(2)(C)—authorize a user's access only upon his

This court has not found Fifth Circuit authority on the question whether violating the terms of service of a publicly accessible website rises to the level of acting "without authorization" or "exceeding authorization" within the meaning of the CFAA.[8] Consequently, the court turns to sister circuits for guidance. The Ninth Circuit has held that "a violation of the terms of use of a website—without more—cannot establish liability under the CFAA." *Facebook*, 844 F.3d at 1067. And, more recently, in *hiQ Labs, Inc. v. LinkedIn Corp.*, the Ninth Circuit concluded that, due to "*Van Buren*'s distinction between computer users who can or cannot access a computer system," the "without authorization" clause does not apply to "publicly available sections [of websites that] lack limitations on access," in essence, when those "sections are open to anyone with a web browser." *hiQ Labs, Inc. v.*

> agreement to follow specified terms of service. If the "exceeds authorized access" clause encompasses violations of circumstance-based access restrictions on employers' computers, it is difficult to see why it would not also encompass violations of such restrictions on website providers' computers."

*Van Buren*, 593 U.S. at 394.

[8]In Ownwell's response brief, it cites *United States v. Phillips* for the proposition that "[n]either [Defendant], nor members of the public obtain [] authorization . . . merely by viewing a log-in page, or clicking a hypertext link." *United States v. Phillips*, 477 F.3d 215, 220-21 (5th Cir. 2007). *Phillips* is inapposite. The defendant in that case executed a "brute-force attack" on UT's TXClass application, stealing other people's data by automatically transmitting social security numbers into the website. *Id.* at 218. In the words of the Fifth Circuit, "a user [could not] gain access to the TXClass application itself without a valid Social Security Number password to which UT ha[d] affirmatively granted authorization." *Id.* at 220. In the next sentence, the Fifth Circuit used the language quoted by Ownwell, stating, "[n]either [Defendant], nor members of the public, obtain such authorization from UT merely by viewing a log-in page, or clicking a hypertext link." *Id.* at 220-21. In this case, according to the SAC, one merely goes to the web page and enters an address.

*LinkedIn Corp.*, 31 F.4th 1180, 1198-99 (9th Cir. 2022) (internal quotation marks and citation omitted). Since this decision, many district courts have agreed.[9]

C

The court holds that Ownwell has not plausibly pleaded that IPG accessed Ownwell's website "without authorization." The court finds *hiQ Labs.* instructive, and holds that because Ownwell's savings estimate tool was "publicly available" and Ownwell has not alleged any "limitations on access," this clause is inapplicable here. Ownwell's allegations that IPG violated its terms of service by systematically collecting data are more aptly analyzed under the "exceeds authorization" clause.

The court likewise finds that Ownwell has not plausibly pleaded that IPG's use of Ownell's website "exceed[ed] [its] authorized access," within the meaning of the CFAA. This is not the circumstance contemplated by the Supreme Court where an individual "accesses a computer with authorization but then obtains information located in particular areas of a computer—such as files, folders, or databases—that are off limits to him." *Van Buren*, 593 U.S. at 396. That is, Ownwell's core allegation is not that IPG accessed a part

---

[9] *See, e.g.*, *Ryanair DAC v. Booking Holdings Inc.*, 636 F.Supp.3d 490, 508 (D. Del. 2022) ("[I]n order for the CFAA's 'without authorization' and 'exceeds authorized access' elements to apply, some sort of authentication mechanism (e.g., the use of usernames and passwords) must be employed to limit access to the website."); *Greenburg v. Wray*, 2022 WL 2176499, at *2 (D. Ariz. June 16, 2022) ("[I]f 'anyone with a browser' could access the website, it had no limitations on access."); *Meta Platforms, Inc. v. BrandTotal Ltd.*, 605 F.Supp.3d 1218, 1262 (N.D. Cal. June 6, 2022) ("[W]here a website is made available to the public without any authentication requirement at least in the first instance, the concept of without authorization does not apply." (internal quotation marks and citation omitted)).

of its website that was "off limits," but rather that the volume of its use exceeded the terms of service and that IPG acted with an improper purpose.

The court is persuaded, however, that "a violation of the terms of use of a website—without more—cannot establish liability under the CFAA." *Facebook*, 844 F.3d at 1067. In so holding, the court need not decide, as other district courts have, that a technological "authentication mechanism (e.g., the use of usernames and passwords)" necessarily must be employed for an individual or entity to "exceed[] authorized access." *Ryanair DAC v. Booking Holdings Inc.*, 636 F.Supp.3d 490, 508 (D. Del. 2022). The court merely concludes that a violation of the terms of use of a website is insufficient standing alone. Because Ownwell merely alleges that IPG exceeded authorized access by violating "the ToU on Ownwell's website," the court holds that Ownwell has failed to plead a plausible claim under the CFAA. SAC ¶ 214.

IX

Although the court is dismissing several of Ownwell's claims, it will grant it leave to replead. *See Shah v. Univ. of Tex. Sw. Med. Sch.*, 54 F.Supp.3d 681, 707 (N.D. Tex. 2014) (Fitzwater, C.J.) ("Because the court's usual practice when granting a motion to dismiss is to permit a plaintiff at least one opportunity to replead, the court will give Shah an opportunity to amend his complaint." (citing *In re Am. Airlines, Inc.*, Priv. Litig., 370 F.Supp.2d 552, 567-68 (N.D. Tex. 2005) (Fitzwater, J.)). Ownwell must file a third amended complaint no later than 28 days after the date this memorandum opinion and order is filed.

* * *

For the reasons explained, the court grants in part and denies in part IPG's motion to dismiss and grants Ownwell leave to replead.

**SO ORDERED**.

October 1, 2026.

SIDNEY A. FITZWATER
SENIOR JUDGE